IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————

|  |  |  |
|---|---|---|
| MASSACHUSETTS RIVERS ALLIANCE, NEPONSET RIVER WATERSHED ASSOCIATION, CONNECTICUT RIVER WATERSHED COUNCIL, INC. d/b/a CONNECTICUT RIVER CONSERVANCY, MERRIMACK RIVER WATERSHED COUNCIL, TAUNTON RIVER WATERSHED ALLIANCE, OARS, INC., IPSWICH RIVER WATERSHED ASSOCIATION, MYSTIC RIVER WATERSHED ASSOCIATION, JONES RIVER WATERSHED ASSOCIATION, AND NORTH AND SOUTH RIVERS WATERSHED ASSOCIATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Civil Action No. 17-11825 |
| E. SCOTT PRUITT, ADMINISTRATOR of U.S. ENVIRONMENTAL PROTECTION AGENCY, in his official capacity, and U.S. ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

———————————————————————

## **COMPLAINT**

### Introduction

1.     Plaintiffs Massachusetts Rivers Alliance, Neponset River Watershed Association, Connecticut River Watershed Council, Inc. d/b/a Connecticut River Conservancy, Merrimack River Watershed Council, Taunton River Watershed Alliance, OARS, Inc., Ipswich River Watershed Association, Mystic River Watershed Association, Jones River Watershed Association, and North and South Rivers Watershed Association (collectively, "plaintiffs") bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, to challenge the U.S. Environmental Protection Agency's ("EPA") action postponing the effective date of the

General Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems in Massachusetts ("MS4 General Permit") from July 1, 2017, to July 1, 2018. *See* Postponement of the July 1, 2017 Effective Date of General Permits for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems in Massachusetts signed by Deborah Szaro, Acting Regional Administrator, EPA Region 1, dated June 29, 2017 (attached hereto as Exhibit A); *see also* Notice of EPA's Action to Postpone the Effective Date of the EPA Region 1 Clean Water Act National Pollutant Discharge Elimination System ("NPDES") General Permits for Stormwater Discharges From Small Municipal Separate Storm Sewer Systems in Massachusetts, 82 Fed. Reg. 32,357 ("MS4 Stay Notice") (attached hereto as Exhibit B).

2.      The Massachusetts MS4 General Permit was signed April 4, 2016, and was to become effective July 1, 2017. A copy of the MS4 General Permit is attached hereto as Exhibit C; a copy of the Notice of Availability of Final NPDES Permit published on April 13, 2016, is attached hereto as Exhibit D (81 Fed. Reg. 21,862).[1]

3.      Stormwater discharge is a leading cause of pollution into the rivers, streams, wetlands, lakes, ponds, and coastal waters of Massachusetts. More than half of the Commonwealth's rivers and streams fail to meet water quality standards due to stormwater pollution.

4.      As stormwater runs off impervious surfaces, it picks up chemical and microbial contaminants that pose a physical, biological, and chemical hazard to aquatic habitats, stream function, and ultimately public health. The hazard affects entire watersheds as stormwater discharges from numerous individually-managed sources are combined. Contaminated

---

[1] While referenced as a single general permit, the MS4 permit consists of three technically distinct NPDES permits for discharges of stormwater from small MS4s to certain waters in Massachusetts: (1) traditional cities and towns (NPDES Permit No. MAR041000), (2) non-traditional cities and towns (NPDES Permit No. MAR042000), and (3) non-traditional transportation MS4s (NPDES Permit No. MAR043000).

stormwater contains pathogens, excess nutrients, heavy metals, and other toxins. It kills aquatic life and creates algal blooms that can suffocate fisheries and some, like cyanobacteria, that also harm human health. Pathogens from stormwater can enter drinking water supplies and swimming areas and cause respiratory problems and diseases, such as hepatitis.

5.      The MS4 General Permit applies to small municipal separate sewer systems (MS4s) located in urbanized areas of the Commonwealth of Massachusetts, including (a) traditional cities and towns, (b) state, federal, county and other publicly-owned properties; and (c) state transportation agencies. Among other conditions, the permit requires MS4s to meet effluent limitations and prohibitions, satisfy water quality requirements, implement stormwater management practices, and engage in public education.

6.      Prior to issuance of the MS4 General Permit, EPA had not updated the permit terms and conditions since 2003 even though the 2003 permit expired in 2008 after a 5-year term. *See* 40 C.F.R. § 122.46(a) ("NPDES permits shall be effective for a fixed term not to exceed 5 years"). EPA has administratively continued the 2003 permit since its 2008 expiration date, and, as a result of EPA's unlawful stay, it remains in effect today.

7.      It took eight years -- from 2008 until 2016 -- of *extensive* public review, discussion, negotiation, research, compromise, and notice and comment rulemaking involving all of the numerous impacted stakeholders for EPA to settle on the terms and conditions of the MS4 General Permit. The final permit, appendices and attachments, as well as EPA's response to comments on the draft permit and supplemental fact sheet information are available at https://www.epa.gov/npdes-permits/massachusetts-small-ms4-general-permit.[2]

8.      By issuing the MS4 General Permit, and based on an administrative record comprised of thousands of pages reflecting widespread consideration and analysis of relevant

---

[2] EPA's response to comments document alone is over 600 pages.

data, impacts, and public comment, EPA concluded in 2016 that the permit satisfied the applicable statutory requirements of the Clean Water Act, 33 U.S.C. §§ 1251, *et seq*. ("CWA" or "Clean Water Act"). *See* Exhibit D hereto.

9.     Yet, two days before the permit was to become effective, EPA, under the new leadership of Administrator Pruitt, issued the MS4 Stay Notice, abruptly halting the municipalities' progress in working to comply with MS4 General Permit's requirements. The MS4 Stay Notice has no legal or rational basis.

10.     EPA purported to issue the MS4 Stay Notice under Section 705 of the APA, 5 U.S.C. § 705, which authorizes agencies to postpone the effective date of a rule "pending judicial review," if the agency finds that "justice so requires." This standard is only met if the four-part test applicable to a postponement of agency action pending judicial review is satisfied. *See, e.g., Sierra Club v. Jackson*, 833 F. Supp.2d 11, 30 (D.D.C. 2012). Here, EPA failed to make *any* of the findings necessary to satisfy the four-part test, including consideration of the permit stay on public health and the environment.

11.     While judicial review of the MS4 General Permit, under Section 509(b) of the Clean Water Act, has been sought by two municipalities and four additional organizations, EPA did not issue the MS4 Stay Notice to ensure that judicial review of the permit would be effective. EPA not only has asked the U.S. Court of Appeals for the D.C. Circuit to hold judicial review in abeyance, but it also has stated that it intends to use the postponement to "determine what, if any, changes are appropriate in the permit and determine next steps." 82 Fed. Reg. 32358. *See* Exhibit B hereto.

12.     Any revision or repeal of the MS4 General Permit would require notice and comment rulemaking pursuant to Section 553 of the Administrative Procedure Act, 5 U.S.C. §

553, which cannot feasibly be completed within the one-year period set by EPA. Accordingly, the one-year postponement is arbitrary and likely to result in even further delay.

13.     The MS4 Stay Notice violates the APA for multiple reasons including, but not limited to, the following:

a.     EPA failed to make the findings required to support a determination that "justice so requires" an administrative postponement under 5 U.S.C. § 705. Section 705 findings must meet a four-part test that courts apply when determining whether a postponement of agency action pending judicial review is appropriate. The four-part test requires EPA to have considered and weighed the following factors when issuing the postponement: (1) whether the legal challenges to the agency action by the parties requesting the stay are likely to succeed on the merits; (2) whether there will be irreparable harm to those parties absent a stay; (3) whether there is harm to other interested parties if the agency action is stayed; and (4) whether the public interest is served by a stay. The MS4 Stay Notice makes none of the findings necessary to support postponement of the MS4 General Permit. Nor could it.

b.     EPA's ostensible reasons for the MS4 Stay Notice are invalid and implausible, representing a complete disregard for the administrative rulemaking process required by the APA.[3] EPA's stated intention to use the stay to consider revising the MS4 General Permit without regard to the extensive process that led to its issuance is facially

---

[3] EPA primarily justified the postponement by stating that it "may decide to make changes to the permit" as a result of alternative dispute resolution ("ADR"). 82 Fed. Reg. 32,358-32,359. Even if ADR to consider permit revisions were a lawful basis to issue the postponement under 5 U.S.C. § 705, which it is not, the reason would still be pretextual under the circumstances presented here. A successful outcome for all petitioners through ADR is extremely unlikely given that the positions of the various petitioners are irreconcilable. EPA itself has recognized the petitioners' opposing viewpoints and the difficulty in aligning their positions.

inconsistent under Section 705 of the APA and therefore unauthorized by law. EPA's reference to the existence of judicial review of the MS4 General Permit is a pretense, because EPA has asked the U.S. Court of Appeals for the D.C. Circuit to hold the judicial review proceedings in abeyance. Further, delaying the control of stormwater pollution in Massachusetts so that the permit may be aligned with New Hampshire's, another of EPA's stated reasons for the stay, has no rational basis. There is no plausible reason to allow another year of stormwater pollution into Massachusetts' waterways without the protections afforded by a new MS4 General Permit simply because the effective date of New Hampshire's own and unique stormwater discharge permit is a year away.

14.     Plaintiffs request that the Court hold that EPA's MS4 Stay Notice is arbitrary and capricious, an abuse of discretion, not in accordance with law, in excess of EPA's statutory jurisdiction and authority, short of statutory right, without observance of procedure required by law, and otherwise in violation of 5 U.S.C. §§ 705, 706, and vacate the MS4 Stay Notice so that the MS4 General Permit will be reinstated effective immediately.

## Jurisdiction and Venue

15.     This Court has jurisdiction under the federal question statute, 28 U.S.C. § 1331 (action arising under the laws of the United States), and may issue a declaratory judgment under 28 U.S.C. § 2201(a) and grant further relief under 28 U.S.C. § 2202. Plaintiffs have the right to bring this action in this Court under the APA, 5 U.S.C. §§ 701-706, which provides for judicial review of final agency actions for which there is no other adequate remedy in a court.

16.     Venue is proper because, among other reasons, a substantial part of the events or omissions giving rise to the claims occurred in this District, and the plaintiff organizations reside in this District. *See* 28 U.S.C. § 1391(e)(1).

**Plaintiffs**

17.     Plaintiffs are non-profit member organizations with longstanding interests in improving water quality in the Commonwealth of Massachusetts for the benefit of public health and the environment. Plaintiffs have a particular interest in protecting the rivers, streams, and watersheds of Massachusetts, which are significantly impacted by pollution from stormwater discharge.

18.     Plaintiff Massachusetts Rivers Alliance ("Mass Rivers") is a non-profit membership organization incorporated under the laws of the Commonwealth of Massachusetts. Founded in 2007, Mass Rivers is headquartered at 14 Beacon St., Boston, MA 02108. It has 65 organizational members and 670 individual member households throughout the state. The mission of Mass Rivers is to protect and restore Massachusetts rivers by focusing on four areas: water quality, stream flow, wildlife habitat, and investment in green infrastructure. Stormwater discharges are Massachusetts' most pressing water pollution problem.

19.     Stormwater touches all four aspects of the mission of Mass Rivers, as poorly-managed stormwater contributes to water pollution, exacerbates both low streamflow and flooding problems, degrades wildlife habitat, and requires infrastructure investments. Mass Rivers works with its members and partner organizations to restore water quality through public outreach, education, technical assistance for municipalities, and working to ensure better permitting, enforcement, and funding of water resource regulations.

20.     Mass Rivers invested significant resources in the public notice and comment rulemaking process that resulted in the issuance of the MS4 General Permit. Staff reviewed, commented, and publicly testified on both the 2010 and 2014 draft permits. In addition, Mass Rivers coordinated a series of workshops for municipalities to encourage the creation of

stormwater utilities to help defray the costs of complying with the MS4 General

Permit. Workshop presenters included watershed advocates, EPA representatives who addressed

the basic requirements of the anticipated final permit, planners, and municipal representatives

from towns that had already created stormwater utilities.

21.     Plaintiff Neponset River Watershed Association ("NepRWA") is a member-

supported conservation group working since 1967 to clean up and protect the Neponset River, its

tributaries and surrounding watershed lands. NepRWA has 670 individual member households.

The Neponset River watershed covers a 120-square mile area that drains into the Neponset

River. It is home to more than 330,000 people, provides drinking water to approximately

120,000 people, and includes parts of 14 cities and towns: Boston (Hyde Park, Mattapan, and

Dorchester), Canton, Dedham, Dover, Foxborough, Medfield, Milton, Norwood, Quincy,

Randolph, Sharon, Stoughton, Walpole, and Westwood. NepRWA is headquartered at 2173

Washington St., Canton, MA 02021. NepRWA's mission is to clean up and protect the water,

waterways, and watershed lands of the Neponset River. It has taken a leading role in addressing,

preventing, and remediating stormwater pollution.

22.     NepRWA participated in the public notice and comment rulemaking process that

culminated in issuance of the MS4 General Permit, including by submitting comments on the

draft MS4 General Permit.

23.     Plaintiff Connecticut River Watershed Council, Inc. d/b/a Connecticut River

Conservancy ("CRC") is headquartered at 15 Bank Row, Greenfield, MA 01301. It is a non-

profit membership organization with 1,034 household members. The Connecticut River is New

England's longest river, running through New Hampshire, Vermont, Massachusetts and

Connecticut. CRC was founded in 1952 to confront the river's immense water pollution

challenges and to become an innovative leader for the protection of the Connecticut River's 11,000 square mile watershed. There are over 400 towns and cities in the four-state watershed. In Massachusetts, the watershed encompasses all of Franklin, Hampshire, and Hampden counties and a portion of Worcester and Berkshire counties. In 2010, there were 692,942 people living in the three Massachusetts counties that are entirely within the watershed. The ecological and cultural importance of the Connecticut River was recognized by the federal government in the 1990s when the river was designated an American Heritage River, the entire watershed a National Fish and Wildlife Refuge (Silvio O. Conte National Wildlife Refuge), and most recently in 2012 as the first (and only) National Blueway by former Secretary of Interior Ken Salazar. In Massachusetts, 78 miles of the Westfield River, one of the major tributaries to the Connecticut River, is designated as a Wild and Scenic River. The Connecticut River is habitat for federally rare and endangered species and includes extensive and globally significant tidelands in Connecticut as it empties into Long Island Sound.

24.     Stormwater discharges are a problem throughout the Connecticut River watershed. As part of its core mission, CRC works with communities as well as state and federal governments to try and create effective solutions to stormwater pollution to support both the economy and the environment. CRC has a proven history, and matching expenditure of resources, of working to limit the discharge of untreated sewage and polluted rainwater into the rivers, streams, and tributaries of the Connecticut River watershed. CRC has collected water samples throughout the watershed for analysis of bacteria and nutrients, which includes a weekly bacteria monitoring program in Massachusetts at recreational access sites in the Connecticut River, and coordination among partner groups to post bacteria data online at

www.connecticutriver.us ("Is it Clean?" page). CRC has conducted grant projects to identify bacteria source areas and work with local municipalities to eliminate these sources.

25.     CRC made a presentation on stormwater management financing at a 2015 workshop for municipalities to help defray the cost of MS4 General Permit compliance under the new permit. CRC participated in the public notice and comment rulemaking process that culminated in issuance of the MS4 General Permit, including by submitting comments on the 2010, 2011, and 2014 draft MS4 General Permits.

26.     Plaintiff Merrimack River Watershed Council ("MRWC") is a non-profit, membership organization founded in 1976 with a mission to protect, improve and conserve the Merrimack River watershed for people and wildlife through education, recreation, advocacy and science. The Merrimack River watershed encompasses 78 cities and towns in Massachusetts. MRWC is headquartered at 60 Island Street, Suite 211-E, Lawrence, MA 01840, and has 350 individual members.

27.     Reducing stormwater pollution is a key component of MRWC's mission. MRWC has conducted workshops and educational sessions on stormwater; formed formal partnerships with municipalities and other community stakeholders; wrote a "How-to" Manual on tailoring a stormwater education and outreach program for different communities; created a Train-the-Trainer program to allow citizens to educate city and town governments, along with their fellow citizens, on better stormwater management and outreach programs; and created visual ads to help reduce water pollution through stormwater discharge. MRWC also sits on the coordinating council of the Greenscapes North Shore initiative, the focus of which is helping area municipalities to implement the public education requirements of the MS4 program, and it is currently supported by grants from the Cox Family Fund and the New England Water

Environment Association to further develop outreach and education around the impacts of and remedies for polluted stormwater runoff in the Merrimack River watershed. MRWC participated in the public notice and comment rulemaking process that culminated in issuance of the MS4 General Permit, including by submitting comments on the draft MS4 General Permit.

28.     Plaintiff Taunton River Watershed Alliance ("TRWA") is a non-profit, membership organization founded in 1988 with a mission to restore and properly manage water and related natural resources within the Taunton River Watershed. It has 300 members. In 2009, the Taunton River was designated a Wild and Scenic River by the National Park Service, the U.S. Congress, and President Obama. Twenty cities and towns, including Taunton, Fall River, Bridgewater, and Brockton, lie entirely within the watershed, along with portions of twenty-three others. Approximately 500,000 people live and work within the watershed, which includes densely or moderately developed areas of homes, schools, businesses and other workplaces and roadways.

29.     TRWA works to protect and restore water quality in the watershed, in part, by conducting monthly water quality monitoring at 19 sites in the watershed from March to November. Data collected through this program strengthens TRWA's ability to participate and contribute to EPA rulemaking on draft discharge permits to ensure that harmful levels of nitrogen and other pollutants in the river and its tributaries will be reduced. TRWA participated in the public notice and comment rulemaking process that culminated in issuance of the MS4 General Permit, including by submitting comments on the draft MS4 General Permit.

30.     Plaintiff OARS, Inc. ("OARS") is a non-profit, membership organization founded in 1986 with 725 members. It is headquartered at 23 Bradford Street, Concord, MA 01742, and is a direct abutter to the Assabet River, owning property off Forest Road in Stow, MA. OARS's

mission is to work towards the protection, improvement and preservation of the Sudbury, Assabet, and Concord Rivers, and their tributaries and watersheds for the purposes of public recreation, water supply, and wildlife habitat. The Sudbury-Assabet-Concord watershed is 399 square miles in size, includes 30 towns and two cities. Twenty-nine miles of the Sudbury, Assabet and Concord Rivers are federally-designated as a Wild & Scenic River, are heavily used for tourism, recreation, fishing and wildlife, and host two national wildlife refuges and Minute Man National Historical Park. The Concord River is the public drinking water supply for the town of Billerica. OARS has operated a water quality monitoring program for 26 years, the last 17 years as EPA-certified.

31.     Stormwater is a serious pollutant of surface waters throughout the Sudbury-Assabet-Concord watershed, an area that has experienced rapid development and increase in impervious surface in the past decade. OARS has participated in the public notice and comment rulemaking process leading to the issuance of the MS4 General Permit in Massachusetts, including by submitting comments and testifying in 2014 on the draft Permit. OARS made a presentation on stormwater management financing at a workshop for municipalities to help defray the cost of MS4 General Permit compliance.

32.     Plaintiff Ipswich River Watershed Association ("IRWA") is a non-profit, membership organization founded in 1977. IRWA works in partnership with communities, businesses, schools, and other organizations and residents to protect the river. It is headquartered at 143 County Road, Ipswich, MA, and has 1,030 individual members. The Ipswich River and its 45 tributary streams cover an area of 155 square miles. The Ipswich River Watershed is home to about 160,000 people and includes all or portions of 21 towns, including Burlington, Reading, and Woburn. The watershed provides drinking water to approximately 350,000 people and

businesses in 14 communities including: Beverly, Boxford, Danvers, Hamilton, Ipswich, Lynn, Lynnfield, Middleton, North Reading, Peabody, Salem, Topsfield, Wenham, and Wilmington.

33.     Polluted stormwater runoff is the most significant water quality problem facing the Ipswich River, and it contributes to shellfish bed closures in the Ipswich River tidal estuary. IRWA collaborates with watershed communities on projects to clean up polluted stormwater runoff. It also assists communities in managing stormwater and using low-impact development strategies to preserve and restore natural drainage patterns. IRWA has developed a handbook for municipal managers in the Ipswich River Watershed to provide a checklist and fact sheets summarizing 20 tools that communities can use to manage water resources; many of the tools address stormwater clean-up. IRWA participated in the public notice and comment rulemaking process that culminated in issuance of the MS4 General Permit, including by submitting comments on the draft MS4 General Permit.

34.     Plaintiff Mystic River Watershed Association ("MyRWA") is a non-profit, membership organization founded in 1972 to protect and restore the Mystic River, its tributaries and watershed lands. MyRWA is headquartered at 20 Academy Street, Suite 306, Arlington, MA 02476-6401. It has 667 individual members. The Mystic River Watershed is one of the most urban and densely populated watersheds in the Commonwealth. It covers 76 square miles and encompasses 22 communities in Massachusetts. Its headwaters begin in Reading, MA and form the Aberjona River, then flow into the Upper Mystic Lake in Winchester. From the Lower Mystic Lake, the Mystic River flows through Arlington, Somerville, Medford, Everett, Chelsea, Charlestown, and East Boston before emptying into Boston Harbor.

35.     Stormwater pollution is one of the most persistent challenges in the Mystic River Watershed, including causing poor water quality from stormwater runoff and sewage

contamination along Alewife Brook. To monitor the impact of stormwater discharge, since 2000, MyRWA has collected water samples throughout the watershed for analysis of bacteria and nutrients. Using the data, MyRWA is able to track changes in water quality over time, identify areas of concern and work with local agencies and municipalities to find solutions. MyRWA participated in the public notice and comment rulemaking process that culminated in issuance of the MS4 General Permit, including by submitting comments on the draft MS4 General Permit.

36.     Plaintiff Jones River Watershed Alliance ("JRWA") is a non-profit, membership organization founded in 1985 with a mission to protect, enhance and restore the quality of the natural resources in Southeastern Massachusetts, specifically including the Jones River and Cape Cod Bay. JRWA is headquartered at 55 Landing Road in Kingston, MA and has a contributing membership of 700 households. The Jones River is the largest river draining to Cape Cod Bay, and is important to the ecosystem of the Gulf of Maine. The watershed of the Jones is 30 square miles, shared by the towns of Duxbury, Pembroke, Plympton and a portion of Plymouth. Over 150,000 people are served from water supplied from the watershed including over 10 million gallons a day diverted from Silver Lake to the City of Brockton.

37.     Since 1994, JRWA has continuously worked to address the impact of stormwater pollution on the Jones River watershed. JRWA's projects have included devoting resources to improving the Town of Kingston's stormwater discharge into the Jones River from municipal roads; conducting base line monitoring of stormwater pollution in the river leading to system wide interest, upgrades, tidal area sewering, and other improvements; and advocating for improvements to discharges by participating in permit development, and supporting town efforts to secure grants for stormwater improvement.

14

38.     Plaintiff North and South Rivers Watershed Association ("NSRWA") is a non-profit, membership organization founded in 1970 with a mission to preserve, restore, maintain and conserve in their natural state the waters and related natural resources within the watershed. It is headquartered at 214 South Street, Norwell, MA 02061, and has 1,100 members. In 1977, the North and South Rivers received National Natural Landmark status by the National Park Service and, in 1978, the North River was designated a state scenic protected river. Twelve cities and towns, including Abington, Duxbury, Hanover, Hanson, Hingham, Marshfield, Norwell, Pembroke, Rockland, Scituate, Weymouth, and Whitman, lie within the watershed. Approximately 235,000 people live and work within the watershed's towns, with densely or moderately developed areas of homes, schools, businesses and other workplaces and roadways.

39.     NSRWA works to protect and restore water quality in the watershed, in part, by conducting water quality monitoring at 10 sites in the watershed from June to August. Data collected through this program strengthens NSRWA's ability to participate and contribute to EPA rulemaking on draft discharge permits to ensure that harmful levels of pollutants in the river and its tributaries will be reduced. NSRWA participated in the public notice and comment rulemaking process that culminated in issuance of the MS4 General Permit, including by submitting comments on the draft MS4 General Permit.

40.     Plaintiffs have standing to bring this action on their own behalf and on behalf of their members. Plaintiffs and their members have been and will continue to be injured by EPA's failure to implement the MS4 General Permit and failure to control stormwater pollution consistent with the requirements of the Clean Water Act and the NPDES program. Plaintiffs' members, who could bring suit in their own right, are injured because they use and enjoy waters

throughout Massachusetts that receive pollution from stormwater discharges caused by operators subject to the MS4 General Permit. Delay of implementation of the MS4 General Permit impairs plaintiffs' members' use and enjoyment of those waters, causing them to curtail activities that they might otherwise enjoy, derive less enjoyment or benefit from other activities, and suffer reasonable concerns and anxiety about the potential for future harm.

41.     Plaintiffs' members' injuries are actual, concrete and particularized, and fairly traceable to the challenged actions of the defendants. The requested relief will redress these injuries.

42.     Plaintiffs are also harmed because their organizations have a history of involvement and investment of economic and institutional resources in exercising their legal rights and working towards the reduction of water pollution in Massachusetts caused by stormwater discharge, including the issuance of more protective MS4 stormwater discharge permits and the implementation and enforcement of those permits. Plaintiffs' injuries are actual, concrete and particularized, and fairly traceable to the challenged actions of the defendants. The requested relief will redress these injuries.

## Defendants

43.     Defendant E. Scott Pruitt is the Administrator of the U.S. Environmental Protection Agency. He is sued in his official capacity only. His office is located at William Jefferson Clinton Building, 1200 Pennsylvania Avenue, N.W., Washington, D.C. 20460. Mr. Pruitt bears responsibility for the acts complained of in this Complaint.

44.     Defendant U.S. Environmental Protection Agency ("EPA") is an agency of the federal government. The agency is located at William Jefferson Clinton Building, 1200 Pennsylvania Avenue, N.W., Washington, D.C. 20460. EPA operates a regional office in

Massachusetts located at 5 Post Office Square, Boston, MA 02109. EPA is charged with

implementing and enforcing the Clean Water Act for the benefit of public health and the

environment. EPA bears responsibility for the acts complained of in this Complaint.

## STATUTORY FRAMEWORK

## CLEAN WATER ACT

45.     The Clean Water Act is the principal federal statute enacted to protect the quality

of waters of the United States. The Clean Water Act's goals are "to restore and maintain the

chemical, physical, and biological integrity of," and to "eliminate[]" "the discharge of pollutants

into" the waters of the United States. 33 U.S.C. § 1251(a), (a)(1).

46.     The National Pollutant Discharge Elimination System ("NPDES") program under

the Clean Water Act is the primary federal vehicle to regulate the quality of the nation's

waterbodies. The NPDES program was developed in 1972 to reduce pollutants at their source

from industrial process wastewater, municipal sewage discharges, and municipal storm drainage

systems. These point sources were known to be responsible for poor, often drastically degraded

conditions in receiving waterbodies.

47.     To address the role of stormwater in causing or contributing to water quality

impairments, Congress added Section 402(p) to the CWA (*see* 33 U.S.C. § 1342(p)), which

brought stormwater control into the NPDES program. In 1990, EPA issued the Phase I

Stormwater Rules. The Phase I rules require NPDES permits for operators of municipal separate

storm sewer systems (MS4s) serving populations over 100,000 and for runoff associated with

industry, including construction sites five acres and larger. In 1999, EPA issued the Phase II

Stormwater Rule to expand the requirements to small MS4s and construction sites between one

and five acres in size.

48.     The Clean Water Act prohibits the discharge of "pollutants" through a "point source" into a "water of the United States" without a valid NPDES permit. The permit contains limits on what the permittee can discharge, monitoring and reporting requirements, and other provisions to ensure that the discharge does not impair water quality or threaten public health. Specifically for municipal dischargers, permits must include requirements to effectively prohibit non-stormwater discharges into the storm sewers, as well as controls to reduce the discharge of pollutants to the maximum extent practicable.

49.     To comply with Clean Water Act regulations, each MS4 permittee, in addition to meeting other requirements, must develop and implement a stormwater management plan. These plans contain the stormwater control measures ("SCMs") (sometimes known as best management practices or "BMPs") that will be used to prevent stormwater emanating from these sources from degrading nearby waterbodies. These SCMs range from structural and engineering methods and controls such as detention ponds and bioswales, to nonstructural methods such as designing new developments to reduce the percentage of impervious surfaces.

50.     NPDES permits are issued for a term of five years. 40 C.F.R. §122.46. Massachusetts is one of four states where EPA retains primacy for the NPDES program and responsibility for issuing permits. The agency issues each permit first in draft form, and provides a public comment period and responds to comments received before issuing the permit in final form.

51.     EPA issued the previous general MS4 permit for Massachusetts in 2003 and it expired in 2008. The permit has been administratively continued since its expiration.

52.     After two years of multi-stakeholder input and negotiation, EPA issued a draft stormwater permit in 2010, which was thereafter subject to extensive notice and comment. In

response to the stakeholder input and further research and data analysis, EPA issued a second draft permit in 2014, which replaced the 2010 draft permit. The 2014 draft was thereafter subject to extensive notice and comment.

53.     After eight years of considering and analyzing voluminous information, research, data, comments, concerns, and questions submitted by numerous stakeholders representing the full range of interests, EPA issued the final MS4 General Permit on April 4, 2016. *See* Exhibits C and D hereto. The MS4 General Permit did not have an effective start date until July 1, 2017, more than a year after issuance. The one-year delay in the effective date was intended to and did provide municipal operators time to prepare for implementation of the new MS4 General Permit.

54.     The Commonwealth of Massachusetts maintains separate permitting authority for stormwater discharges under Massachusetts law. *See* Mass. Gen. Laws c. 21 § 43; Mass. Code Regs. Title 314. The Massachusetts Department of Environmental Protection ("MassDEP") co-issued the MS4 General Permit with EPA. On August 14, 2017, MassDEP announced that it, like EPA, would postpone the effective date of the MS4 General Permit until July 1, 2018. MassDEP stated that its decision to stay implementation of the MS4 General Permit at a state level was due to the "federal postponement" and MassDEP's "goal to establish a coordinated federal-state implementation process."

## ADMINISTRATIVE PROCEDURE ACT

55.     The APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

56.     A permit or rule is not automatically stayed pending the outcome of judicial

review. Section 705 of APA, 5 U.S.C. § 705, states:

> When an agency finds that justice so requires, it may postpone the effective date
> of action taken by it, pending judicial review. On such conditions as may be
> required and to the extent necessary to prevent irreparable injury, the reviewing
> court, including the court to which a case may be taken on appeal from or on
> application for certiorari or other writ to a reviewing court, may issue all
> necessary and appropriate process to postpone the effective date of an agency
> action or to preserve status or rights pending conclusion of the review
> proceedings.

57.     Under 5 U.S.C. § 705, the standard for stays at the administrative level is the

same for stays undergoing judicial review. Each is governed by the four-part test applicable to

stays of agency actions pending judicial review.

## FACTS

58.     Stormwater runoff is a principal contributor to water pollution in rivers, streams,

lakes, and marine environments, and it presents one of the most difficult challenges of water

pollution control, and one of the greatest threats to clean water in Massachusetts.

59.     Stormwater runoff is generated from rain and snowmelt that flows over land or

impervious surfaces, such as paved streets, parking lots, and building rooftops, and does not soak

into the ground. It is a noxious mix of bacteria, chemicals, metals, nutrients, hydrocarbons, and

other pollutants that flows down storm drains into the waterways the public relies on for drinking

and recreation.

60.     Common pollutants in stormwater runoff include antifreeze, detergents,

fertilizers, gasoline, household chemicals, oil and grease, paints, pesticides, fecal matter from

pets, farm animals, and wildlife, road salt, trash such as plastics and cigarette butts, ammonia,

and solvents. Thermal pollution to rivers and streams impacted by runoff from impervious

surfaces is also a concern.

61.     Stormwater runoff has a deleterious impact on nearly all the urbanized waters in Massachusetts. It has resulted in (a) prohibitions and restrictions of harvesting shellfish due to high bacterial levels, often due to urban runoff and failing septic systems; (b) beach closings or swimming advisories due to bacterial levels exceeding health and safety standards; (c) pesticide contamination of nearly all urban streams exceeding human health and aquatic life benchmarks; (d) contamination of fish from inorganic compounds; (e) degraded freshwater wetland quality; (f) drastically reduced populations of Eastern brook trout relative to their historical range; and (g) increased flooding throughout urban and suburban areas resulting in property damage.

62.     According to EPA, stormwater discharges are causing or contributing to at least 55% of the impairments in all Massachusetts' assessed waters.

63.     To protect public water resources, the Clean Water Act requires communities, construction companies, industries, and others to use stormwater controls to filter out pathogens and pollutants and/or to prevent pollution by controlling it at its source.

64.     The NPDES stormwater program regulates certain stormwater discharges from three potential sources: municipal separate storm sewer systems (MS4s), construction activities, and industrial activities. The permitting mechanism is designed to prevent stormwater runoff from washing harmful pollutants into local surface waters.

65.     On May 1, 2003, EPA Region 1 issued its Final General Permit for Stormwater Discharges From Small Municipal Separate Storm Sewer Systems ("2003 MS4 Permit") that covers "traditional" (i.e., cities and towns) and "non-traditional" (i.e., Federal and state agencies) MS4 operators located in the states of Massachusetts and New Hampshire.

66.     The 2003 MS4 Permit expired on May 1, 2008, but it was administratively continued and remains in effect for authorized operators pending implementation of the 2016 MS4 General Permit.

67.     Between 2008 and 2010, EPA issued two separate draft small MS4 General Permits in Massachusetts to replace the 2003 small MS4 Permit: one for operators located in the North Coastal watershed and the other for those located in the Interstate, Merrimack and South Coastal watersheds.

68.     The Notice of Availability of the draft General Permit for Discharges from Small Municipal Separate Storm Sewer Systems (MS4) located in North Coastal Massachusetts was published in the Federal Register on February 4, 2010. 75 Fed. Reg. 5788. This draft covered the North Coastal region, including but not limited to the watersheds of the Ipswich River and Neponset River.

69.     The Notice of Availability of the draft General Permit for Discharges from Small Municipal Separate Storm Sewer Systems located in the Interstate, Merrimack and South Coastal watersheds in Massachusetts was published in the Federal Register on November 4, 2010. 75 Fed. Reg. 67960.

70.     EPA held a public hearing on March 9, 2011 and the public comment period for the draft permits ended March 11, 2011. A Federal Register notice describing the public hearing and the extension of the public comment period was published on February 15, 2011. 76 Fed. Reg. 8734.

71.     As a result of the public process, EPA issued a new draft MS4 General Permit in 2014. The 2014 draft MS4 General Permit was released for public comment on September 30, 2014, and the comment period ended February 27, 2015. EPA received, reviewed, and responded

to over 150 unique comment letters. The 2016 MS4 General Permit incorporates changes made in response to the comments received.

72.     On April 13, 2016, eight years after the 2003 MS4 General Permit expired, EPA issued the long overdue MS4 General Permit with an effective date of July 1, 2017. The MS4 General Permit represents the culmination of more than eight years of work, consultation, revision, review, and negotiation by EPA and with the numerous, pertinent stakeholders in Massachusetts, including the plaintiffs in this lawsuit.

73.     When issuing the permit on April 13, 2016, EPA concluded that "[t]he conditions in the general permit are established pursuant to the Clean Water Act (CWA) section 402(p)(3)(iii) to ensure that pollutant discharges from small MS4s are reduced to the Maximum Extent Practicable (MEP), protect water quality, and satisfy the appropriate requirements of the CWA." 81 Fed. Reg. 21,863. *See* Exhibit D hereto.

74.     In deciding to co-issue the permit in April 2016, MassDEP concurred with EPA's determinations and certified that the MS4 General Permit met the compliance requirements of the Clean Water Act.

75.     The MS4 General Permit establishes water-quality based requirements for small MS4s in Massachusetts to monitor and reduce nitrogen/phosphorous, metals, solids, bacteria/pathogens, chloride, and oil and grease from impaired receiving waters. The permit establishes Notice of Intent requirements, prohibitions, and best management practices (BMPs) for stormwater discharges, and establishes six minimal control measures, which require municipalities to: (1) provide educational material about stormwater to residents, industry, commercial entities, and construction operators; (2) at least annually provide an opportunity for the public to participate in the development/implementation of their Stormwater Management

Program (SWMP); (3) find and eliminate sources of non-stormwater from their storm sewer system (known as Illicit Discharge Detection and Elimination or "IDDE"); (4) establish an ordinance from management of stormwater discharges from construction sites that disturb one or more acres of land; (5) address stormwater runoff from new development and redevelopment that disturb one or more acres of land; and (6) implement good housekeeping practices in municipal operations such as vehicle maintenance, open space, buildings, and infrastructure.

76.     In the first year of the MS4 General Permit, beginning on July 1, 2017 through June 30, 2018, MS4 operators were to meet certain requirements, including but not limited to: (1) prepare and submit a Notice of Intent to permit coverage (within first 90 days); (2) establish written procedures for winter road maintenance including storage of salt and sand, minimize the use of sodium chloride and other salts, and ensure snow disposal activities do not result in disposal of snow into surface waters; (3) develop and update a written Stormwater Management Plan; (4) complete written IDDE procedures and document sanitary sewer overflows; and (5) create written procedures for inspecting construction sites for proper sediment controls.

77.     After EPA and MassDEP issued the MS4 General Permit, certain parties filed petitions for judicial review with the U.S. Courts of Appeals, only two of which were municipalities subject to the permit: the City of Lowell and the Town of Franklin. The remaining petitioners included the Center for Regulatory Reasonableness, Conservation Law Foundation/Charles River Watershed Association, the National Association of Homebuilders, and the Massachusetts Coalition for Water Resource Stewardship, Inc. The petitions have been consolidated before the U.S. Court of Appeals for the D.C. Circuit. *See Center for Regulatory Reasonableness, et al. v. EPA*, No. 16-1246 (D.C. Cir.).

78.     On May 26, 2017, petitioners Massachusetts Coalition for Water Resources, the

City of Lowell, and the Town of Franklin ("Requesting Petitioners") requested that EPA Region

1 postpone the effective date of the MS4 General Permit for one year. EPA agreed. Acting

Region 1 Administrator Deborah Szaro signed the stay decision on June 29, 2017; the notice was

published in the Federal Register on July 13, 2017. *See* Exhibits A and B hereto.

79.     In issuing the MS4 Stay Notice, EPA stated:

> EPA would like to explore the use of alternative dispute resolution (ADR)
> in this case in order to engage with the various petitioners and jointly see
> if there might be a resolution that could avoid the need for litigation. EPA
> believes that it is fair to postpone the effective date of the permit so that
> eligible MS4s in Massachusetts that could seek coverage under the permit
> would not be subject to enforceable permit terms and conditions under the
> Massachusetts permit that could change as a result of ADR. Postponing
> the effective date for one year pending judicial review should give EPA
> ample time to determine what, if any, changes are appropriate in the
> permit and to determine next steps.
>
> Pending any such decision by the Agency, postponing the effective date of
> the permit for one year will postpone certain obligations—and the
> associated costs—that would otherwise be incurred in the first year's
> implementation of the Massachusetts permit. Such costs would include
> monetary and staff time for preparation and submittal of a Notice of Intent
> (NOI) to be covered by the permit. Also in the first year, in the absence of
> the postponement of the permit's effective date, the MS4s would have to
> update portions of their existing Stormwater Management Plans. Given the
> status of the litigation, the possibility that the parties will engage in ADR
> and that the Agency may decide to make changes to the permit, the
> Agency believes it is reasonable to defer imposition of these obligations
> and costs for the period of the postponement.

82 Fed. Reg. 32,358-32,359.

80.     EPA also stated that it wanted to align the effective date of the Massachusetts

MS4 General Permit with the New Hampshire small MS4 general permit, which has an existing

effective date of July 1, 2018. *Id.* at 32,359. Based on the foregoing, "EPA concluded that justice

requires postponement of the effective date."

81.     In the MS4 Stay Notice, EPA did not make a finding of actual irreparable harm as to the Requesting Petitioners, did not make a determination that those petitioners were likely to succeed on the merits of their challenges to the MS4 General Permit, did not consider whether other parties interested in the permit would be adversely affected by the stay, and did not consider the environmental effects of the stay or whether it was consistent with Congress's declaration of the national goals and policy contained in the Clean Water Act. Nor did EPA consider whether the stay was consistent with the regulations and requirements under the Clean Water Act, and of the NPDES program in particular.

82.     Nowhere in the MS4 Stay Notice did EPA consider or address *any* of the benefits of the MS4 General Permit or the impact of the delay in implementation of those benefits on the environment and on the municipalities that had already begun spending and investing funds to comply with the permit. Nowhere in the MS4 Stay Notice does EPA address the multi-year, multi-stakeholder process that led to issuance of the permit in 2016. Nowhere in the MS4 Stay Notice does EPA address the long-term costs to municipalities of postponing the implementation of current stormwater controls.

83.     The MS4 Stay Notice does not mention the four-part test EPA must satisfy to justify a postponement of agency action pending judicial review, let alone make any findings concerning the likelihood of success on the merits of any of the legal challenges to the MS4 General Permit, the harm to other parties interested in the MS4 General Permit, or the MS4 Stay Notice's effect on the public interest.

84.     EPA did not provide the public with notice or an opportunity to comment on the MS4 Stay Notice prior to its issuance.

85.     Shortly after EPA published the MS4 Stay Notice "pending judicial review," EPA requested that the judicial review of the MS4 General permit be held in abeyance.

**FIRST CLAIM FOR RELIEF: VIOLATION OF THE APA, 5 U.S.C. §§ 705, 706**

**(FOR FAILURE TO MAKE REQUIRED FINDINGS)**

86.     The allegations set forth in Paragraphs 1 through 85 are incorporated by reference as if fully set forth herein.

87.     EPA's promulgation of the MS4 Stay Notice is a "final agency action for which there is no other adequate remedy in a court" within the meaning of the APA, 5 U.S.C. § 704.

88.     An agency may only postpone the effective date of action taken by it if it finds that "justice so requires."  5 U.S.C. § 705.

89.     An agency must base any administrative postponement under 5 U.S.C. § 705 on specific findings consistent with equitable principles, which require consideration of whether the legal challenges to the agency action by the parties requesting the stay are likely to succeed on the merits, whether there will be irreparable harm to the those parties absent a stay, whether there will be harm to other interested parties who would be deprived of the benefits of the agency's action because of the stay, and that the public interest is served by a stay.

90.     The MS4 Stay Notice does not make any equitable findings supporting agency issuance of a stay pending judicial review, much less findings that would support any of the four required equitable factors.

91.     The MS4 Stay Notice does not address whether any of the Requesting Petitioners were likely to prevail on the merits in the litigation.

92.     The MS4 Stay Notice does not address whether any of the Requesting Petitioners were likely to suffer irreparable harm – that is, more than economic loss -- if the effective date of the MS4 General Permit was not postponed pending judicial review.

93.     The MS4 Stay Notice does not consider whether postponing the effective date of the MS4 General Permit will harm other parties interested in the permit, let alone attempt to measure such harm.

94.     The MS4 Stay Notice does not include a finding that staying the effective date of the permit is in the public interest.

95.     The MS4 Stay Notice is arbitrary and capricious, an abuse of discretion, not in accordance with law, in excess of EPA's statutory jurisdiction and authority, short of statutory right, without observance of procedure required by law, and otherwise in violation of 5 U.S.C. §§ 705, 706.

**SECOND CLAIM FOR RELIEF: VIOLATION OF THE APA, 5 U.S.C. §§ 705, 706**

**(FAILURE TO ISSUE STAY NOTICE FOR PURPOSE OF JUDICIAL REVIEW)**

96.     The allegations set forth in Paragraphs 1 through 95 are incorporated by reference as if fully set forth herein.

97.     If "justice so requires," 5 U.S.C. § 705 permits an agency to postpone the effective date of a rule "pending judicial review."

98.     Title 5 U.S.C. § 705 does not authorize an agency to stay an agency action for other purposes, such as pending agency reconsideration or revision of the rule.

99.     The MS4 Stay Notice states that a purpose of the postponement was to provide EPA with the opportunity to consider whether to make changes to the MS4 General Permit.

100.     Shortly after publishing the MS4 Stay Notice, EPA asked the reviewing court to hold judicial review in abeyance for an unknown and undetermined amount of time.

101.     The purpose of the MS4 Stay Notice was not to allow for the conclusion of the pending judicial proceedings.

102.     The MS4 Stay Notice is arbitrary and capricious, an abuse of discretion, not in accordance with law, in excess of EPA's statutory jurisdiction and authority, short of statutory right, without observance of procedure required by law, and otherwise in violation of 5 U.S.C. §§ 705, 706.

## THIRD CLAIM FOR RELIEF: VIOLATION OF THE APA, 5 U.S.C. §§ 705, 706

## (FAILURE TO ADDRESS RELEVANT FACTORS)

103.     The allegations set forth in Paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

104.     Federal administrative agencies are required to engage in reasoned decisionmaking. An agency's actions must fall within its lawful authority, and the process by which it reaches those actions must be logical and rational. An agency's action must rest on the consideration of relevant factors.

105.     Because Congress did not delegate to EPA the authority to interpret Section 705 of the APA, EPA's interpretation of Section 705 is not entitled to deference.

106.     The APA sets forth an orderly process for notice and comment rulemaking.

107.     EPA's postponement of the effective date of the MS4 General Permit has no rational basis, is short of statutory right, and fails to observe the rule-making procedures required by the APA.

108.   The grounds offered by EPA in the MS4 Stay Notice do not justify postponement of the MS4 General Permit. Of the numerous municipalities subject to the MS4 General Permit in Massachusetts, only two (Franklin and Lowell) sought judicial review of the permit and only those two asked EPA to postpone the effective date of the permit.

109.   The MS4 Stay Notice does not consider the impacts of the postponement on any person or entity apart from the interests of those two municipalities. It does not address the eight-year multi-stakeholder process that culminated in issuance of the MS4 permit in 2016; address how a stay could be consistent with EPA's previous finding the permit satisfied the requirements of the Clean Water Act; address the impact of the MS4 Stay Notice on the environment or public health and safety; or address the cost already incurred by municipalities in beginning to implement the MS4 General Permit requirements.

110.   In deciding to postpone the effective date of the MS4 General Permit, EPA did not make a finding that the Requesting Petitioners would suffer irreparable harm as defined by law; EPA did not consider or measure the harm to other interested parties; EPA did not assess the damage done to public health and the environment as a result of the postponement; EPA did not determine whether the stay was in the public interest.

111.   The grounds upon which EPA issued the MS4 Stay Notice do not justify postponing implementation of the MS4 General Permit.

112.   Formal rulemaking exists to provide notice and predictability to the regulated parties. The MS4 Stay Notice undercuts regulatory predictability and consistency.

113.   After eight years of engaging in extensive public notice and comment rulemaking, which culminated in issuance of the MS4 General Permit, EPA's MS4 Stay Notice thwarts implementation of the MS4 General Permit without rational basis.

114.    Section 705 of the Administrative Procedure Act does not authorize EPA to summarily postpone implementation of a permit while it considers whether it should revise or repeal certain terms and conditions of the permit.

115.    The MS4 Stay Notice is arbitrary and capricious, an abuse of discretion, not in accordance with law, in excess of EPA's statutory jurisdiction and authority, short of statutory right, without observance of procedure required by law, and otherwise in violation of 5 U.S.C. § 706.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs request that the Court:

a.    declare that the MS4 Stay Notice is unlawful under the APA, 5 U.S.C. § 706(2)(A);

b.    vacate the MS4 Stay Notice and issue an order reinstating the MS4 General Permit effective immediately;

d.    award Plaintiffs their litigation costs and reasonable attorneys' fees in this action; and,

e.    provide any other necessary and appropriate relief.

DATED: September 22, 2017

MASSACHUSETTS RIVERS ALLIANCE, NEPONSET RIVER WATERSHED ASSOCIATION, CONNECTICUT RIVER WATERSHED COUNCIL, INC. d/b/a CONNECTICUT RIVER CONSERVANCY, MERRIMACK RIVER WATERSHED COUNCIL, TAUNTON RIVER WATERSHED ALLIANCE, OARS, INC., IPSWICH RIVER WATERSHED ASSOCIATION, MYSTIC RIVER WATERSHED ASSOCIATION, JONES RIVER WATERSHED ASSOCIATION, AND NORTH AND SOUTH RIVERS WATERSHED ASSOCIATION,

By their counsel,

*/s/ Irene C. Freidel*
Irene C. Freidel
BBO No. 559051
*Access to Justice Fellow*
c/o Massachusetts Rivers Alliance
14 Beacon St.
Boston, MA 02108
(617) 947-6349
ifreidel.atjfellows@gmail.com

*/s/ Kevin Cassidy*
Kevin Cassidy
BBO No. 681301
Earthrise Law Center
P.O. Box 445
Norwell, MA 02061
(781) 659-1696
Email: cassidy@lclark.edu